Opinion issued July 31, 2014



In The

# Court of Appeals

For The

## First District of Texas

———————————

## NO. 01-12-00920-CR

———————————

**ARTURO PETRICIOLET, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 228th District Court
Harris County, Texas
Trial Court Case No. 1344112

**O P I N I O N**

A jury found appellant, Arturo Petriciolet, guilty of the offense of aggravated assault of a family member[1] and assessed his punishment at confinement for fifty years. The trial court further found that he used a deadly weapon, namely, a firearm, in the commission of the offense. In his sole issue, appellant contends that the trial court erred in admitting expert testimony during the punishment phase of trial.

We affirm.

## Background

During the guilt phase of trial, the complainant, Leticia Gracia, testified that she is appellant's former girlfriend and the mother of his youngest child. Their relationship had been "off and on" during the five-year period preceding the incident at issue, and they had lived together for a portion of that time. Once their relationship ended, the complainant maintained an amicable relationship with appellant, and he frequently visited his daughter and the complainant's older daughter at the complainant's house.

The complainant explained that on the evening of July 28, 2010, appellant came over to her house for dinner, to plan a birthday party for one of the children, and to watch television. She noted that appellant, who usually carried a semi-automatic firearm, placed the firearm on a living room table upon his arrival at her

[1] *See* TEX. PENAL CODE ANN. § 22.02 (a), (b)(1) (Vernon 2011); *see also* TEX. FAM. CODE ANN. §§ 71.0021, .003, .005 (Vernon 2014).

2

home. At the end of the evening, appellant and the complainant went upstairs for him to say good-night to the children. The complainant then followed appellant down the stairs, into the dark living room, where he, without warning, "picked up his gun" and shot her "in the face." She noted that, by the light of a nearby bathroom, she saw him pick up the firearm. After he shot her, the complainant begged appellant to help her, but to no avail. She then pretended that she was dead because she feared that he would shoot her again. Appellant "laughed," "walked away," and left the house on foot.

Houston Police Department ("HPD") Officer P. McGill testified that he was dispatched to the scene, where the complainant told him that "her boyfriend shot her in the face," and she gave McGill a physical description of appellant. HPD Sergeant R. Chandler testified that he later detained appellant, whom he had seen "walking down [a] sidewalk with no shoes on" near the scene. As Chandler brought appellant back to the scene, appellant said that he wanted to tell his family that he was "sorry." However, he then became increasingly agitated, "screaming . . . that he did not want to go back to where this had happened." Appellant then attempted to kick out the window of Chandler's patrol car, and Chandler had to restrain appellant's legs. Chandler noted that HPD did not recover the firearm.

Appellant testified that he owns a "gun," specifically, a "Smith & Wesson, 40 millimeter," that he carries in his car for "personal protection." On the day of the shooting, in accordance with his routine, he brought the gun into the complainant's house in a "tactical bag" and placed it under the complainant's television. Appellant explained that after the children went upstairs, he and the complainant went outside on the back patio and smoked marijuana. He began to hallucinate and although he remembered later coming in and going upstairs, he "black[ed] out" before he made it to the bedroom. He later awoke in the complainant's bed and found her standing next to him with his cellular telephone, attempting to read his text messages. When appellant tried to get dressed and leave, the complainant begged him not to leave her. Appellant explained that he felt like there was "something wrong" with him, and he thought that he saw the shadow of another man in the house. He then ran out the door without his shoes or keys, did not see his gun between the time dinner ended and he left the house, and had no memory of the shooting.

After the jury found appellant guilty, the complainant, during the punishment phase of trial, testified that, during the course of their relationship, appellant had been "very controlling" of her and would often wait for her in the parking garage where she worked. He did not allow her to wear make-up or brush her hair, see her mother or her friends, or receive telephone calls outside of work.

The complainant explained that appellant is an alcoholic, had a history of violent behavior towards her, including slapping her on at least two occasions, and had threatened to "beat [her] up" if she tried to have a romantic relationship with anyone else.

The complainant further testified that she and her children "live in constant fear." Although she has been paying the mortgage on her house for the past two years, she it is too "scared" to go home. Thus, the complainant and her daughters live together in a single bedroom at her parents' home. They sleep with the lights on and do not attend school functions or otherwise leave the house unless required. As a result of the shooting, the complainant lost vision in her left eye, has had five facial operations, and will require future reconstructive surgeries. Her teeth have fallen out and she cannot open her mouth. The complainant's food must be prepared in a blender, and she drinks it through a straw.

Victoria Mahabir, the complainant's sister, testified that the family is "on constant alert" and "living in a constant state of fear [and] panic." They are afraid appellant is "going to come back and finish [the complainant] off or harm the rest of the family." The complainant's oldest daughter testified that the family lives in fear, and they worry that appellant is going to harm someone else.

The State presented as an expert witness, J. Varela, Director of Family Violence Services at the Harris County District Attorney's Office. She testified

that she has a master's degree in social work, is a licensed clinical social worker, has received professional training in dealing with domestic violence, has taught a class at the graduate level, and speaks at professional conferences. Varela's duties at the District Attorney's office include overseeing twelve staff members in providing crisis intervention counseling to approximately 3,500 people per year. She has previously testified "[a]t least 150 [times] as an expert witness" in civil and criminal cases.

Varela specifically testified as follows regarding domestic-violence assessment techniques:

[State]: Ms. Varela, are you aware—familiar with something that's called a [lethality] assessment?

. . . .

[Varela]: That's the one that we use as based on research from the National Institute of Justice and some objective measures that we try to ask all of our complainants about, just kind of to assess, you know, how dangerous the situation could potentially be. It's a risk assessment. So there's certain questions that you ask—"Did this happen? Is this behavior present or is not present?" And it's a risk. Even if you have a lot of factors, it does not mean this is going to happen. It just means your risks are higher or lower.

[State]: What are those factors?

[Varela]: If there was ever any violence during pregnan[cy]. If there's a substance abuse issue, every threat or use of a weapon in the past, any kind of increased use of violence, interaction with law enforcement without change in behavior and this kind of controlling and you know, jealous obsessive sort of behavior.

6

Appellant objected to Varela's testimony and requested a hearing to determine whether it "[met] the threshold of scientific evidence." At a hearing outside the jury's presence, Varela testified that she has "been a social worker for 17 years"; has been the Director of Family Violence Services for twelve years; has a master's degree in social work, concentrating in the area of "[p]olitical social work"; and has trained "probably—hundreds of police officers on domestic violence issues." She explained that she has "seen thousands of people" and has evaluated "a lot of cases," but has never done any field work related to domestic violence.

Varela further testified that she met with the complainant for "[o]nly a couple of hours" on August 3, 2010 and performed "a typical assessment," which involved asking the complainant about "the course of the relationship" with appellant and the "first, worst and last incidents of violence." The complainant told Varela that appellant "was always very jealous and controlling"; her relationship with him had been "off and on" due to his "violence and drinking"; and, although she had ended the relationship, she allowed him to continue to visit the children. Varela explained the basis of "the assessment instrument" as follows:

> [State]: Can you explain to us what is a [lethality] assessment?
>
> [Varela]: A [lethality] assessment[] is an instrument that can be used to assess the level of risk in a domestic violence situation. It's important to realize risk is not predictive.

7

|  |  |
|---|---|
|  | You know, you cannot say because they have a high risk factor, it's research [sic] based on a whole big group of people that say it's more likely to happen or not more likely to happen. |
| [State]: | Is the [lethality] assessment[] that you just told us based on a lot of something that's commonly used in your field? |
| [Varela]: | Yes.  And this one was published by the National Institute of Justice. |
| [State]: | And so how long has that [lethality] assessment been used in the field of domestic violence to assess, just the risk, not the probability; but how long has it been used? |
| [Varela]: | This was published in, I think, 2003; and we've been using it—I'm not sure how many years we've been using it. . . . I feel safe saying at least six. |
| . . . . |  |
| [State]: | Is [it] something that other experts like yourself rely upon across the country in testifying in these types of cases? |
| [Varela]: | Yes. |
| [State]: | Have you testified as an expert in other courts regarding a [lethality] assessment? |
| [Varela]: | Yes. |
| [State]: | Has your testimony been accepted in those other courts regarding this assessment? |
| [Varela]: | Yes. |
| [State]: | Did you perform this same [type] of assessment and use these same questions or procedures in this case? |
| [Varela]: | Yes. |
| [State]: | And do you have an opinion in this case? |
| [Varela]: | An opinion of what? |
| [State]: | The use of the [lethality] assessment on [appellant] based on your interview of [the complainant]? |

[Varela]: Are you asking me, do I have an opinion about his further risk—or her further risk?

[State]: Is that something that you used in this case?

[Varela]: Yes.

Varela noted that although she was not sure if the use of lethality assessments had been tested, she was aware that they have a "pretty high" rate of error—"[i]t's like 30 or 40 percent." When asked whether there exists a series of standards or controls concerning the assessment criteria, Varela responded:

There's an instrument that we can use that has the questions on it; but what we've done—we sort of put that into our own data base so we can collect statistics on it.

When I get the actual journal article, I can tell you more about the reviews and stuff; but it was done—the research was done in 10 different cities. And what they did, they compared groups of people who were killed in domestic violence and people that received a potentially letha[l] injury and lived. They looked at the previous factors that sort of led up to those instances.

Varela opined that, based on the lethality assessment that she performed in this case, appellant "scores high on the risk assessment," noting that the use of a weapon alone is "the highest risk factor." She further noted that her testimony had been excluded in other courts on the basis of a lack of relevance.

Appellant objected that Varela's testimony was unnecessary for the jury to make a determination regarding whether his use of a firearm created a high-risk situation. Varela agreed, stating, "The number one thing is the fact that he's used a weapon in the past and he's actually shot her and I think like the average man on

the street, I don't even know if we need research to tell us that. . . . I should hope that . . . most of us would have enough common sense to realize that." The trial court decided to admit Varela's testimony.

After the jury returned, the trial court stated that it would allow Varela "to testify as an expert in domestic violence, social work[,] and to testify concerning an assessment instrument that's used in her field and her conclusion as a basis of that assessment instrument." It then instructed the jury as follows:

> [I]n coming to her conclusion using that assessment instrument, [Varela] has to rely on information given to her from other people; and she uses that information to reach her assessment. She cannot tell you whether or not the information that's given is true or not true. All right; but we do know that is the information that she has to reach her assessment. In other words, those things are not offered for the truth of the matter, just so that you know what she used to reach her assessment.

Varela told the jury that although she had not interviewed appellant, she had interviewed the complainant, her daughters, and appellant's ex-wife. She noted that she had formed an opinion in this case based on her investigation and the testimony at trial. The State then asked Varela if she had the ability to determine whether "some of the things" people said to her were "true or not true," and she responded, "Yes." Varela then opined that the incident at issue was not an anomaly; rather, it "fit into a pattern of behavior." And the lethality-assessment factors present in this case include: "previous use of violence, [previous] threats" and "the type of control and jealous behavior that [appellant] exhibited in the past."

10

Varela then concluded that appellant "score[d] high on the risk assessment" because he had used a firearm, although she explained that this was not a prediction of future domestic violence.

## Standard of Review

We review a trial court's ruling on the admissibility of expert testimony for an abuse of discretion. *Lagrone v. State*, 942 S.W.2d 602, 616 (Tex. Crim. App. 1997); *Hernandez v. State*, 53 S.W.3d 742, 750 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). We consider the trial court's ruling in light of the evidence presented at the time of its ruling, and we uphold the ruling if it lies within the zone of reasonable disagreement. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). We cannot conclude that a trial court abused its discretion merely because, under the same circumstances, we might have ruled differently. *See Hernandez*, 53 S.W.3d at 750. Rather, we gauge an abuse of discretion by whether the trial court acted without reference to any guiding rules or principles. *Id.* Thus, a trial court enjoys wide latitude in determining whether expert testimony is admissible. *Id.*

## Expert Testimony

In his sole issue, appellant argues that the trial court erred in allowing Varela to testify, during the punishment phase of trial, as an expert on "lethality

assessment" because she was not qualified to testify on the issue and her testimony was not reliable.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. Before admitting expert testimony, a trial court must determine that (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case. *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006). Thus, the trial court must determine that the expert is qualified to testify and the proffered testimony is reliable and relevant. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006).

### *Reliability*

"'[R]eliability depends upon whether the evidence has its basis in sound scientific methodology,'" which "'demands a certain technical showing.'" *Id.* at 133 (quoting *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)). Such a showing allows a trial court to "'weed out testimony pertaining to so-called junk science.'" *Id.* (quoting *Jordan*, 928 S.W.2d at 555). "Thus, just because 'junk

12

science or otherwise inadequately tested scientific theories might be shown to relate to the facts of a case,' it will not always have a sufficiently reliable basis." *Id.* (quoting *Jordan*, 928 S.W.2d at 555). If a court determines that underlying facts or data do not provide a sufficient basis for an expert's opinion, the opinion is inadmissible. TEX. R. EVID. 705(c); *Vela*, 209 S.W.3d at 133.

The Texas Court of Criminal Appeals has set forth a three-prong reliability test and identified seven non-exclusive factors for courts to consider in assessing the reliability of expert testimony concerning "hard sciences."[2] *Vela*, 209 S.W.3d at 133–34 (citing *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)). The *Kelly* test for expert reliability requires that (1) the underlying scientific theory be valid, (2) the technique applying the theory be valid, and (3) the technique have been properly applied on the occasion in question. 824 S.W.2d at 573. Factors that could affect a trial court's determination of expert reliability include, but are not limited to: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the testifying expert; (3)

---

[2] So-called "hard sciences," "areas in which precise measurement, calculation, and prediction are generally possible, include mathematics, physical science, earth science, and life science." *Weatherred v. State*, 15 S.W.3d 540, 542 n.5 (Tex. Crim. App. 2000). In contrast, so-called "soft sciences" generally include the "social sciences or fields that are based primarily upon experience and training as opposed to the scientific method." *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998) *overruled on other grounds*, *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999).

the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573.

In *Nenno v. State*, the court of criminal appeals held that when assessing the reliability of expert testimony concerning the so-called "soft sciences," those that are based on experience or training as opposed to scientific method, "[the] requirement of reliability applies but with less rigor than to the hard sciences." 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds*, *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999). The appropriate considerations are (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon or utilizes the principles involved in that field. *Id*.

Here, appellant argues that "[t]he State did not prove by clear and convincing evidence" that (1) "lethality assessment is a legitimate field of expertise," (2) "a defendant's risk for future domestic violence is a legitimate subject matter within the scope of that field," or (3) "Varela's testimony properly

14

relied upon and/or utilized the principles involved in the field of lethality assessment." *See id*. Appellant asserts that the State "did not cite any cases in which courts [have] allowed such expert testimony" and "did not offer a single treatise, textbook or other scholarly publication" on the topic. In addition, Varela's testimony in this case did not demonstrate that lethality assessment is a legitimate field of expertise because she "offered only vague take-away points from one journal article, which she did not name and which the State did not offer into evidence."

As the proponent of Varela's expert testimony, the State had the burden to show by clear and convincing evidence that Varela's testimony was reliable. *State v. Smith*, 335 S.W.3d 706, 712 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). The State does not direct us to any cases in which "lethality assessment" has been deemed a legitimate area of expertise. *See Nenno*, 970 S.W.2d at 561. In support of its assertion that "the admissibility of expert testimony assessing risk is not a new concept and has been evaluated by courts of appeals," the State relies on two "future dangerousness" cases: *Davis v. State*, 313 S.W.3d 317 (Tex. Crim. App. 2010), and *Russeau v. State*, 171 S.W.3d 871 (Tex. Crim. App. 2005). In capital-murder cases, a "future-dangerousness" special issue ensures that no defendant is sentenced to death unless the jury first finds that he poses a threat of future violence. *Coble v. State*, 330 S.W.3d 253, 268 (Tex. Crim. App. 2010). In such

15

cases, risk assessments of future dangerousness have been recognized as a legitimate field of expertise. *Russeau*, 171 S.W.3d at 884.

In *Davis*, the State's expert, a board-certified psychiatrist who specialized in criminal forensic psychiatric consulting and served on the Texas Manifest Dangerousness Review Board, testified that he examined the defendant's background, applying a widely-accepted combination of actuarial prediction and anamnestic methods to assess the risk of future violence. 313 S.W.3d at 353. And a second expert, a forensic psychologist, explained that he had used "the HCR–20" and "the HARE psychopathy checklist" to assess the defendant's risk for future violence and both assessment tools are widely published, have been subjected to peer review, and are regularly relied upon by other psychologists. *Id.* at 353–54. Based on this underlying testimony, the court concluded that the experts were qualified to offer this expert opinion testimony as to the future dangerousness of the defendant. *Id.* at 354.

In *Russeau*, the State's expert, a licensed psychologist with the Texas Department of Criminal Justice, based her opinions concerning the defendant's future dangerousness on offense reports, autopsy reports, crime-scene photographs, videotapes and transcripts of the defendants' interviews with investigators, witness statements, transcripts of witness interviews, arrest records and prior-offense records, institutional and parole records, jail and probation records, and

16

investigations of the crime scene. 171 S.W.3d at 883–84. She used a combination of theory and technique, which was generally accepted within the scientific community and had been subjected to peer review and publication. *Id.* at 884. And she applied the "guideline of the DSM4," which is published by the American Psychiatric Association and widely used as a standard in that field. *Id.* The State's second expert, a board-certified forensic psychiatrist, testified regarding risk assessment of future dangerousness as a legitimate field of expertise. *Id.* Based on their underlying testimony, the court concluded that the experts were qualified to offer their opinion testimony on the future dangerousness of the defendant. *Id.*

Thus, the assessment of future dangerousness, which involves examining the defendant himself under specific protocols, has been accepted as a legitimate field of expertise within psychology. *See id.* However, the instant case is not a "future-dangerousness" case, i.e., a death-penalty, capital-murder case, in which the State had the burden to prove the defendant a "continuing threat to society." *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b)(1) (Vernon Supp. 2013). And Varela is neither a psychiatrist nor a psychologist. Nor did she use any accepted method of actuarial prediction or psychological testing to evaluate the defendant in this case.

Regardless, whether under *Kelly* or *Nenno*, "reliability should be evaluated by reference to the standards applicable to the particular professional field in

question." *Coble*, 330 S.W.3d at 274. Here, Varela testified that she is a licensed social worker and that "lethality assessment" is "commonly" used in her field. However, she did not offer any specifics to support her assertion, and she did not cite any books, articles, studies, journals, or other clinical social workers who practice in this area. Rather, she relied solely on a single "journal article" that she did not identify and the State did not tender to the trial court. Varela described the research in the unnamed article as having "looked at the previous factors that *sort of* led up to . . . instances [of violence]." (Emphasis added.) She explained that a "lethality assessment" is a risk assessment that involves "research *based on a whole big group of people*" that say domestic violence is "more likely to happen or not more likely to happen." (Emphasis added.) Varela did not testify regarding any specific methodology used to conduct a lethality assessment. She explained that "[t]here's an instrument that we *can use* that has the questions on it; *but what we've done—we sort of put that into our own data base* so we can collect statistics on it." (Emphasis added.) She further explained that her assessment involved asking questions of the victim, but not the defendant. And although she "thinks" lethality assessment "has been tested," she was not sure and would need "to look at the [journal]," which she did not do before completing her testimony at trial. However, she did concede that lethality assessments have a "pretty high" rate of error—that "[i]t's like 30 or 40 percent."

When a witness's methodology and conclusions cannot be validated or have been "otherwise inadequately tested," the proposed testimony is characterized as "junk science." *Coble*, 330 S.W.3d at 274; *Vela v. State*, 209 S.W.3d at 133. Here, the State presented no evidence to validate Varela's methodology and conclusions. Thus, it did not show by clear and convincing evidence that "lethality assessment" is a legitimate field of expertise. *See Nenno*, 970 S.W.2d at 561; *see also Weatherred*, 15 S.W.3d at 542–43 (excluding testimony by expert witness who "claimed that he and others had carried out extensive research" and had written "much on the subject," but failed to produce or name any studies, research, or writings). Accordingly, we hold that the trial court erred in admitting Varela's testimony as an expert on lethality assessment.

In so holding, we emphasize that a trial court, in discharging its duty as a gatekeeper to ensure the relevance and reliability of expert testimony, must determine how the reliability of particular testimony is to be assessed. *Vela*, 209 S.W.3d at 134. We note that although the reliability inquiry is flexible, the proponent must establish some foundation for the reliability of the expert's opinion. *Id.* Although trial courts "may give experts wide latitude in selecting their sources," the trial court "must still evaluate those sources' reliability." *Id.* at 135.

*Harm*

Having concluded that the trial court erred in admitting Varela's testimony, we next determine whether appellant was harmed. Non-constitutional error requires reversal only if it affects the substantial rights of the accused. *See* TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or had but a slight effect. *Barshaw*, 342 S.W.3d at 93.

We review the entire record to ascertain the effect or influence on the verdict of the wrongfully admitted evidence. *Id.* We may consider, among other things: (1) the strength of the evidence of the appellant's guilt; (2) whether the jury heard the same or substantially similar admissible evidence through another source; (3) the strength or weakness of an expert's conclusions, including whether the expert's opinion was effectively refuted; and (4) whether the State directed the jury's attention to the expert's testimony during argument. *See Coble*, 330 S.W.3d at 286–88. Error in the admission of evidence may be rendered harmless when substantially the same evidence is admitted elsewhere without objection. *See*

*Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986) ("Inadmissible evidence can be rendered harmless if other evidence at trial is admitted without objection and it proves the same fact that the inadmissible evidence sought to prove.").

Varela's testimony was erroneously admitted during the punishment phase of trial. And she testified that the "lethality assessment" factors present in this case were appellant's "previous use of violence, [previous] threats, the type of control and jealous behavior that [appellant] exhibited in the past," and his use of a weapon. Varela opined that, based on these factors, appellant "scores high on the risk assessment," and his use of a weapon "alone is the highest risk factor."

We note first that, in regard to the "lethality assessment" factors, the jury heard the same or substantially similar evidence regarding the specifics of appellant's bad acts from other witnesses. *See Coble*, 330 S.W.3d at 286–88; *Anderson*, 717 S.W.2d at 628. The complainant testified about appellant's previous use of violence and threats against her, and his controlling and jealous behavior. Specifically, she testified that appellant had been "very controlling" of her and would often wait for her in the parking garage where she worked. He did not allow her to wear make-up or brush her hair, see her mother or her friends, or receive telephone calls outside of work. She explained that appellant is an alcoholic, had a history of behaving violently towards her, including slapping her

21

on at least two occasions, and had threatened to "beat [her] up" if she tried to have a romantic relationship with anyone else.

The complainant also testified that appellant shot her in the face with a firearm as she was walking down the stairs in her home. And, as a result of the wounds he inflicted, she has lost vision in her left eye, has had five facial operations, and will require future reconstructive surgeries. Her teeth have fallen out and she cannot open her mouth.

Further, the complainant, her sister, and her daughter each testified regarding their fear of appellant based upon his behavior. The complainant explained that she and her children "live in constant fear." And although she is paying a mortgage on her own house, she and her children have lived together in a single bedroom at her parents' home since the shooting. They sleep with the lights on and do not leave the house unless required. The complainant's sister testified that the family is "on constant alert . . . living in a constant state of fear [and] panic." They are afraid appellant is "going to come back and finish [the complainant] off or harm the rest of the family." And the complainant's daughter testified that the family is living in fear and worry that appellant is going to harm someone else.

Next, we note that Varela's testimony was quite weak. *See Coble*, 330 S.W.3d at 286–88. She equivocated, emphasized that her assessment was not predictive of anything, and asserted that expert testimony was not even necessary

for the jury to determine whether appellant, having shot the complainant in the face, posed a "high risk" for future domestic violence.

Moreover, the trial court instructed the jury not to consider the truth of the information underlying Varela's conclusions as follows:

> [I]n coming to her conclusion using that assessment instrument, [Varela] has to rely on information given to her from other people; and she uses that information to reach her assessment. She cannot tell you whether or not the information that's given is true or not true. All right; but we do know that is the information that she has to reach her assessment. In other words, those things are not offered for the truth of the matter, just so that you know what she used to reach her assessment.

And we emphasize that the State did not mention Varela's testimony in its closing punishment argument to the jury. *See id.*

Finally, we note that the evidence of appellant's guilt, which was overwhelming, showed that he committed a particularly brutal act—shooting the complainant in her face shortly after putting their children to bed. The long-term effects of his brutal act upon the complainant are severe and will last the remainder of her life. Thus, there is ample evidence to support the jury's assessment of punishment of confinement for fifty years.

Accordingly, we cannot conclude that the erroneous admission of Varela's testimony had a substantial and injurious effect on the jury's decision on punishment. *See id.* at 287.

We overrule appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

Publish.   TEX. R. APP. P. 47.2(b).