**Opinion issued November 26, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00102-CR

————————————

**OSA ALOHANEKE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 400th District Court
Fort Bend County, Texas
Trial Court Case No. 15-DCR-069234

**MEMORANDUM OPINION**

A jury found appellant, Osa Alohaneke, guilty of the felony offense of murder[1] and assessed his punishment at confinement for forty years. In his sole issue, appellant contends that the trial court erred in admitting certain evidence.

We affirm.

## Background

Veronica Taku testified that she was "very close" friends with the complainant, Evelyne Epiepang, who died in April 2015. According to Taku, the complainant was appellant's girlfriend and appellant and another person, Jeff Lugard, lived in the complainant's home at the time of her death. Taku explained that the relationship between appellant and the complainant was not "good," and the night before she died, the complainant stayed at Taku's home. On that night, appellant "forced" his way into Taku's bedroom in her home to see if the complainant was staying with her, but he then left.

Taku further testified that on April 8, 2015, the day of the complainant's death, the complainant left Taku's home early in the morning and returned to her home to work. Later that day, the complainant called Taku "to meet her" in the area near where the complainant lived because the complainant was talking to law enforcement officers. Taku went to meet the complainant and then afterwards the complainant drove Taku back to Taku's home. While at Taku's home, the

---

[1] See TEX. PENAL CODE ANN. § 19.02(b)(1), (c).

complainant received a telephone call from Lugard, which caused the complainant to be concerned because Lugard stated that appellant was at the complainant's home and he was "banging [on] the door" "trying to break the door to [go] in[side]." Taku then told the complainant to call for emergency assistance, which she did, and Taku and the complainant subsequently drove to meet law enforcement officers in the area "around . . . where [the complainant] live[d]." As Taku and the complainant waited at the designated location to meet law enforcement officers, which was "[n]ot too far from" the complainant's home, appellant saw the complainant and started "shout[ing]" her name. Taku and the complainant then decided to move to a nearby park. Subsequently, after waiting a "long" time for law enforcement officers to arrive, the complainant decided to return to her home because she needed clothes, she wanted to "pick up her stuff," and the law enforcement officers had not yet arrived.

According to Taku, when she and the complainant arrived at the complainant's home, they did not see appellant, and the complainant went to open the front door with her key, while Taku stood behind her. The complainant then looked behind Taku and said "[appellant] is behind you." (Internal quotations omitted.) Taku was surprised that appellant was behind her, and the complainant told appellant, "You know you're not supposed to be in this house." (Internal quotations omitted.) Appellant then "pushed" Taku into the house with the door, as

3

Lugard walked out. Appellant closed the front door to the home and locked it. As Taku and the complainant walked toward the living room and back door of the home, the only people inside the complainant's house were Taku, the complainant, and appellant.

Taku then said to appellant, "What is really happening between you and [the complainant]?" (Internal quotations omitted.) To which appellant respond, "You want to know?" while "open[ing] up his shirt and pull[ing] out a knife." (Internal quotations omitted.) As appellant stabbed Taku with the knife on her face and arm, the complainant shouted, "Oh, my god. This woman . . . why do you want to kill her?" (Internal quotations omitted.) To which appellant responded, "No, I don't want to kill her. I just want to punish her that next time, if people have their problems, she should not come in." (Internal quotations omitted.)

After being stabbed, Taku ran into a bedroom in the home, with the complainant and appellant following her, and she and the complainant shouted, "Help, help, help." (Internal quotations omitted.) Subsequently, the complainant ran out of the bedroom and back to the living room area, with appellant following her. Appellant tripped the complainant, and after she "fell on the floor," appellant immediately "start[ed] stabbing her" with the same knife that he had used to stab Taku. According to Taku, appellant stabbed the complainant "[e]verywhere on her body."

Taku further testified that after appellant stopped stabbing the complainant, he went outside and said, "I've completed my mission, you can call the cops or call anybody. Now, I'm not afraid of nobody. I've completed my mission." (Internal quotations omitted.) When appellant said this, he did not appear to be asking for help. Once law enforcement officers arrived, Taku told them that appellant had "killed" the complainant.

Taku clarified that she did not call for emergency assistance at any time during the stabbing incident and appellant was not stabbed by her, the complainant, or anyone else. When asked whether she was "sure about who stabbed" the complainant, Taku responded, "Yes" and that it was appellant.

Lugard testified that he met the complainant in April 2015 through Taku and he stayed at the complainant's home for a short period of time. At the time, appellant and the complainant were both living in the home, and appellant was the complainant's boyfriend. While living in the complainant's home, Lugard observed "side looks" between the complainant and appellant that indicated "anger or hatred." He also heard appellant tell the complainant, "I will kill you." (Internal quotations omitted.) However, Lugard never saw appellant physically or sexually assault the complainant.

On the night before her death, the complainant stayed at Taku's home. She then returned to her home on the morning of April 8, 2015 to work. Appellant was

also at the complainant's home at this time. At some point that day, appellant borrowed the complainant's car, but when he did not return it on time, the complainant and appellant had a "verbal disagreement," which prompted the complainant to leave her home in her car. According to Lugard, while the complainant was away from her home, she spoke to law enforcement officers and appellant left the complainant's house. After she met with law enforcement officers, the complainant told Lugard to "stay in [her] house," "lock the windows and doors," and to not open the windows and doors for anyone, including appellant. While Lugard was in the complainant's home alone, appellant returned and began "knocking on the door viciously, like he was about to break the door [down]." This prompted Lugard to call the complainant to tell her that appellant was at the house and was "banging on the door." The complainant told Lugard that she would call for emergency assistance, and appellant eventually left the home.

When Taku and the complainant later arrived at the complainant's home that evening, it did not appear that appellant was on the premises, and Lugard opened the front door for the women. Lugard then "all of a sudden" saw appellant "behind" Taku and the complainant. At the time, appellant "look[ed] upset." As Taku, the complainant, and appellant walked into the complainant's house, Lugard walked out because appellant and the complainant began "some sort of dispute or argument." Taku remained in the home with the complainant and appellant, and appellant

6

"slammed" the door on Lugard, locking it and preventing Lugard from reentering the house.

From outside the complainant's home, Lugard heard "loud noise[s] and screams" as well as Taku and the complainant shouting, "Help, help, help." (Internal quotations omitted.) And during this time he called for emergency assistance. As Lugard spoke to emergency assistance personnel on his cellular telephone, appellant came out of the house with "[b]lood all over his hands." Lugard recalled that appellant looked "happy" and was smiling; and he told Lugard that he had "accomplished his purpose" and Lugard "c[ould] go ahead and call the police." According to Lugard, appellant's tone of voice was "sarcastic." Law enforcement officers arrived about three minutes after appellant exited the complainant's home.

Lugard further testified that when he saw Taku come out of the house, it appeared that she had been injured. And when Lugard went inside the home "[t]o check on" the complainant, "[s]he was laying down in a pool of blood" in the living room and appeared to be deceased. Lugard did not see appellant with a knife either before or after the complainant was stabbed.

The trial court admitted into evidence, over appellant's objection, State's Exhibit 26, the audio recording of Lugard's telephone call on April 8, 2015 for emergency assistance. During the telephone call, Lugard requested emergency assistance at the complainant's home. He stated that there was "a man" in the house,

7

i.e., "a murderer," with a knife from "the kitchen" who was "trying to kill them." Lugard identified appellant, by name and by his clothing, and stated that appellant had left the complainant's house and then came back and locked Lugard outside. Lugard told emergency assistance personnel that "the women" were inside the complainant's home "shouting for their lives." And that appellant "had been threatening them" and wanted to "kill them." While Lugard was still speaking with emergency assistance personnel, he stated that appellant had come out of the complainant's house with "blood on his hands."

Fort Bend County Sheriff's Office ("FBCSO") Detective J. Stroud testified that on April 8, 2015, at around 5:20 p.m., while on patrol, she was dispatched in response to a telephone call for emergency assistance to 16315 Alametos Drive, the complainant's home, in Fort Bend County, Texas. When she arrived, she spoke to the complainant who "displayed some concern about what she was reporting." From the complainant, Stroud learned that "some sort of incident had occurred" at the complainant's home between appellant and the complainant. According to Stroud, the complainant reported that she had been assaulted by appellant and that he had threatened her life. Stroud did not see any bruising, redness, cuts, or scrapes on the complainant's body at the time, and the complainant did not require medical assistance.

8

Detective Stroud further explained that the complainant had left her home to meet with Stroud and to report the incident. And the complainant advised Stroud that appellant had also left her home and that she intended to evict him. According to Stroud, Taku also came to the location where the complainant and Stroud were speaking, and at the conclusion of her meeting with the complainant, Stroud understood that the complainant would be leaving the area.

Subsequently, at around 6:58 p.m., on the same day, Detective Stroud was again dispatched to 16315 Alametos Drive in response to another telephone call for emergency assistance.[2] Stroud was initially informed that the call for emergency assistance was in response to "a verbal disturbance" at the location, and it took Stroud "some time" to arrive at the scene. While in route, at around 7:25 p.m., Stroud received "updated information" from emergency assistance personnel which "upgraded" the "level of urgency" of the dispatch call. Stroud arrived at the complainant's home at around 7:28 p.m.

Upon arrival, Detective Stroud saw appellant "standing in the yard" of the complainant's home, "talking on the telephone." Appellant had "a lot of blood" on him, and Stroud detained appellant initially "due to him having blood on his clothing

---

[2]     FBCSO Deputy A. Futch also testified that on April 8, 2015, he was dispatched to 16315 Alametos Drive in response to a telephone call for emergency assistance at 6:56 p.m. from the complainant who stated that appellant was "back at her residence."

and [her] not knowing [exactly] what type of scene [she] had." Appellant did not have any weapons on him at the time. Appellant did not complain of any injuries; however, at some point, Stroud determined that appellant had sustained injuries "[o]n his hands" that did not appear to be life-threatening. And Taku told Stroud that appellant had "killed" the complainant.

Detective Stroud further explained that after entering the complainant's home, she saw the complainant "covered in blood" and on the floor in "the rear corner . . . in the back of the living room." The complainant had "obvious injuries" and was "obviously deceased."[3] Shortly after arriving on the scene, Stroud noticed that Taku also had blood on her. In her report, Stroud indicated that Taku had "severe body trauma."

FBCSO Sergeant T. Chesser testified that he was the lead detective assigned to investigate the complainant's death. Chesser stated that, on April 8, 2015 at around 5:20 p.m., the complainant made the first of three calls for emergency assistance from her cellular telephone. The complainant made a second call for emergency assistance, from the same cellular telephone, at 6:56 p.m. Finally, a third call for emergency assistance came from the complainant's cellular telephone at

---

[3] Deputy Futch recounted that the complainant had "a large, open wound." Her eyes were open, but she was not blinking, and "there was no rise and fall of the chest."

7:27 p.m. According to Chesser, on the day of the complainant's death, no telephone calls for emergency assistance were made from appellant's cellular telephone.

Sergeant Chesser also testified that appellant sustained injuries to both of his hands, but his injuries were consistent with someone using a knife to stab another person, the knife becoming slippery due to blood, and the person unintentionally cutting his own hands due to the "slipping" of the knife.

Dr. Michael Robert Condron, II, assistant medical examiner at the Harris County Institute of Forensic Sciences, testified that he performed an autopsy on the body of the complainant, and he identified "multiple sharp force injuries" as the complainant's cause of death. According to Condron, the complainant had more than thirty "sharp force injuries" on her body, which could have been caused by a knife.[4] The complainant also had a "blunt force injury" on her right elbow, which could have been caused by a fall.

Condron classified three of the complainant's more than thirty "sharp force injuries" as "fatal." First, Condron explained that a cluster of "stab wounds" and "incised wounds," about fifteen, on the complainant's neck, injured the complainant's jugular vein and carotid artery and would have caused "a lot of blood loss" and deprived the complainant's brain of the blood needed to survive. A second

---

[4]    Dr. Mikael Lucas, an emergency-room physician at Memorial Hermann Katy Hospital, testified that a knife can cause serious injury or death.

11

stab wound to the complainant's upper left chest would have been "fatal" because the knife "went into the upper lobe of the [complainant's] left lung and [the] left ventricle of the [complainant's] heart," which "is the part of the heart that pumps blood out to the rest of the body." The injury would have led to "a lot of blood loss" by the complainant and the "sac around the heart" would have "fill[ed] with blood," "impair[ing] the heart's ability to refill with blood and pump." The injury would have also caused "blood [to] com[e] out of the lung and the [complainant's] chest [to] fill[] with blood," which would have compromised her ability to breathe. The third stab wound, which was about six or seven inches deep, punctured the right side of the complainant's chest and went "through the right side of the [complainant's] diaphragm" and into "the right lobe of the [complainant's] liver and the inferior vena cava," i.e., "the big blood vessel that [would] carr[y] blood from the lower part of the [complainant's] body[] back up to [her] heart." This third injury would have resulted in a "great deal of blood loss very quickly." In Condron's opinion, the complainant would have likely died within "several minutes" of receiving the three aforementioned injuries.

FBCSO emergency-assistance operator S. Avina testified that while working on April 8, 2015, she received a call for emergency assistance from a certain telephone number originating in Fort Bend County, Texas.[5] The caller did not report

---

[5]    The telephone number is stated in the record.

that she had received any injuries or that there was an "ongoing emergency," and Avina classified the call as a "middle" priority call. According to Avina, State's Exhibit 5A contained an audio recording of the call for emergency assistance that she received on April 8, 2015.

The trial court admitted into evidence, over appellant's objection, State's Exhibit 5A, the audio recording of the complainant's telephone call on April 8, 2015 at around 5:18 p.m. for emergency assistance.[6] During the telephone call, the complainant, who identified herself, requested the help of law enforcement officers at her home because she was "having threats every minute" and appellant, who she identified by name and clothing, was "threatening to kill [her]." The complainant further told the operator that appellant had "pushed" her that afternoon. The complainant explained that she wanted appellant to leave her house and he did not want to leave. According to the complainant, appellant was "in front of [her] house," and "at" her house while she was speaking to the emergency-assistance operator.[7] When the operator asked the complainant if appellant was "causing a disturbance at th[e] time," the complainant responded, "Yes." The complainant also stated that

---

[6] During the telephone call, the complainant gave the emergency-assistance operator to whom she spoke the number of her cellular telephone from which she was calling. That telephone number matches the telephone number that operator Avina stated she had received an emergency-assistance call from on April 8, 2015.

[7] Later on during the telephone call, the complainant told the emergency-assistance operator that she no longer knew appellant's location.

13

appellant had "slapped [her] several times" and threatened to "destroy [her] car." However, the complainant explained that she had managed to get into her car and drive down the street from her house to call for emergency assistance. The complainant did not know if appellant had a weapon on him at the time. The complainant did not request medical attention.

FBCSO emergency-assistance operator B. Prunty testified that while working on April 8, 2015 at 7:27 p.m., she received a call for emergency assistance from a certain telephone number located in Fort Bend County, Texas.[8] Prunty explained that she was not able to obtain any information from the caller because all that she heard was "screams." Moreover, Prunty could not identify any of the voices that she heard on the call as the caller was not talking, "just screaming." According to Prunty, the caller was "in distress."

Operator Prunty further explained that by using her resources, she was able to determine that the call for emergency assistance that she received had come from Alametos Drive, although she could not determine the exact residence where the call had originated. Prunty did note that other emergency assistance calls were coming in from a location on Alametos Drive at the same time as the emergency-assistance call that she had received. In other words, "[m]ore than one [emergency-assistance

---

[8]     The telephone number is stated in the record. The call that operator Prunty received at 7:27 p.m. was from the same telephone number as the previous call for emergency-assistance that operator Avina had received at 5:18 p.m. that day.

14

operator] was getting [a] call[] [for emergency assistance] from" the Alametos Drive area, and Prunty was able to "coordinate[]" with the other operators to determine a "close location" for the call that she had received. According to Prunty, State's Exhibit 25 contained an audio recording of the call for emergency assistance that she received on April 8, 2015 at 7:27 p.m.

The trial court admitted into evidence, over appellant's objection, State's Exhibit 25, an audio recording of a telephone call for emergency assistance made from the complainant's cellular telephone on April 8, 2015 at around 7:27 p.m. The recording contains about forty seconds to one minute of continuous screaming, followed by indecipherable voices.

### Standard of Review

We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Walker v. State*, 321 S.W.3d 18, 22 (Tex. App.—Houston [1st Dist.] 2009, pet. dism'd). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). When considering a trial court's decision to admit evidence, we will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996) (internal quotations omitted). We will uphold a trial court's evidentiary ruling

15

if it is correct on any theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Generally, the erroneous admission of evidence constitutes non-constitutional error, subject to a harm analysis. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Non-constitutional error requires reversal only if it affects the substantial rights of the accused. *See* TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93–94 (Tex. Crim. App. 2011). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a criminal conviction for non-constitutional error if, after examining the record, we have fair assurance that the error did not influence the jury, or had but a slight effect. *Barshaw*, 342 S.W.3d at 93–94.

We review the entire record to ascertain the effect or influence of the wrongfully admitted evidence on the verdict. *Id.* In assessing the likelihood that the jury's decision was improperly influenced, we consider the testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Id.* at 94; *see also Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). The weight of evidence of the defendant's guilt is also relevant in

16

conducting the harm analysis under rule 44.2(b).  *Neal v. State*, 256 S.W.3d 264, 285 (Tex. Crim. App. 2008); *Motilla*, 78 S.W.3d at 356–58; *Kamen v. State*, 305 S.W.3d 192, 197 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).  And we may consider the closing statements and voir dire, jury instructions, the State's theory, any defensive theories, and whether the State emphasized the alleged error.  *Motilla*, 78 S.W.3d at 355–56; *Hankins v. State*, 180 S.W.3d 177, 182 (Tex. App.—Austin 2005, pet. ref'd).  Error in the admission of evidence may be rendered harmless when substantially the same evidence is admitted elsewhere without objection.  *See Leday v. State*, 983 S.W.2d 713, 717–18 (Tex. Crim. App. 1998); *Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986).

If the erroneous admission of evidence constitutes a violation of constitutional rights, we still perform a harm analysis and must reverse a judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction.  *See* TEX. R. APP. P. 44.2(a); *Henriquez v. State*, 580 S.W.3d 421, 429 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd); *Gutierrez v. State*, 516 S.W.3d 593, 599 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *Lee v. State*, 418 S.W.3d 892, 899 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) ("A Confrontation Clause violation is constitutional error that requires reversal unless we conclude beyond a reasonable doubt that the error was harmless.").  The critical inquiry is not whether the evidence supported the verdict absent the erroneously

17

admitted evidence, but rather "the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations." *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007); *see also Henriquez*, 580 S.W.3d at 429; *Lee*, 418 S.W.3d at 899. We must "calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence." *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001). While our review must focus on the error and its effect, "the presence of other overwhelming evidence that was properly admitted which supports the material fact to which the inadmissible evidence was directed may be an important factor in the evaluation of harm." *Wall v. State*, 184 S.W.3d 730, 746 (Tex. Crim. App. 2006). In determining if the constitutional error may be declared harmless beyond a reasonable doubt, we may consider: (1) how important the out-of-court statement was to the State's case; (2) whether the out-of-court statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and (4) the overall strength of the State's case. *Scott*, 227 S.W.3d at 690; *Gutierrez*, 516 S.W.3d at 599.

## Admission of Evidence

In his sole issue, appellant argues that the trial court erred in admitting into evidence State's Exhibit 5A, the audio recording of the complainant's telephone call on April 8, 2015 at around 5:18 p.m. for emergency assistance, because the exhibit

contained hearsay and inadmissible extraneous-offense evidence, was not relevant, and was prejudicial and the trial court's admission of State's Exhibit 5A violated appellant's Sixth Amendment right "to be confronted with the witnesses against him." (Internal quotations omitted.) *See* U.S. CONST. amend. VI; TEX. R. EVID. 401, 402, 403, 404(b). Appellant also argues that the trial court erred in admitting into evidence State's Exhibit 25, an audio recording of a telephone call for emergency assistance made from the complainant's cellular telephone on April 8, 2015 at around 7:27 p.m., because "[t]he identity of the caller was never established," the exhibit contained hearsay, was not relevant, and was prejudicial and the trial court's admission of State Exhibit 25 violated appellant's Sixth Amendment right "to be confronted with the witnesses against him." (Internal quotations omitted.) *See* U.S. CONST. amend. VI; TEX. R. EVID. 401, 402, 403.

Here, we need not determine whether the trial court erred in admitting State's Exhibits 5A and 25, because even were we to conclude that the exhibits were improperly admitted, appellant, in his brief, does not argue that he was harmed by the admission of the exhibits. *See* TEX. R. APP. P. 44.2(b); *Neal*, 256 S.W.3d at 284–85; *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998) (erroneous admission of evidence subject to harm analysis under rule 44.2(b)); *Petriciolet v. State*, 442 S.W.3d 643, 653–55 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (even if trial court improperly admitted evidence, must still determine whether

19

defendant was harmed by erroneous admission); *see, e.g.*, *Ford v. State*, No. 01-17-00213-CR, 2018 WL 1473948, at \*6 (Tex. App.—Houston [1st Dist.] Mar. 27, 2018, no pet.) (mem. op., not designated for publication) (appellate court need not determine whether trial court erred in admitting exhibits where defendant did not argue in briefing that he was harmed by admission of exhibits); *Wilson v. State*, 473 S.W.3d 889, 900–01 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) ("Here, we do not address whether the trial court erred in admitting the complained-of . . . evidence because even were we to conclude that the trial court erred in admitting such evidence, appellant, in his brief, does not argue that he was harmed by its admission.").

In order to assert an issue on appeal, an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities." TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not adequately brief that issue, i.e., by not presenting supporting arguments, substantive analysis, and citation to authorities. *See id.*; *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000); *Wilson*, 473 S.W.3d at 901. Although appellant argues that the trial court erred in admitting State's Exhibits 5A and 25 into evidence at trial, his brief contains no argument, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purported erroneous admission of the exhibits.

20

*See* TEX. R. APP. P. 38.1(i); *see also Wyatt v. State*, 23 S.W.3d 18, 23 n.5 (Tex. Crim. App. 2000) ("We will not make appellant's arguments for him . . . ."); *Alvarado v. State*, 912 S.W.2d 199, 210 (Tex. Crim. App. 1995) (where appellant's point of error inadequately briefed, appellant "presents nothing for our review"). Accordingly, we hold that appellant waived his complaint on appeal that the trial court erred in admitting into evidence State's Exhibits 5A and 25. *See, e.g.*, *Cardenas*, 30 S.W.3d at 393 (holding issue inadequately briefed where "appellant d[id] not address the question of whether the alleged error . . . was harmless"); *Ford*, 2018 WL 1473948, at *6 (defendant waived complaint trial court erred in admitting certain evidence because "his brief contain[ed] no argument, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purported erro[r]"); *Wilson*, 473 S.W.3d at 900–01.

## Conclusion

We affirm the judgment of the trial court.



Julie Countiss
Justice

Panel consists of Justices Kelly, Hightower, and Countiss.

Do not publish. TEX. R. APP. P. 47.2(b).