ACCEPTED
01-14-00400-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
2/27/2015 12:12:33 PM
CHRISTOPHER PRINE
CLERK

## No. 01-14-00400-CR

In the
Court of Appeals
For the
First Judicial District of Texas
At Houston

————————◆————————

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

2/27/2015 12:12:33 PM

CHRISTOPHER A. PRINE
Clerk

### No. 1379925
In the 184th District Court of
Harris County, Texas

————————◆————————

## TIMOTHY WAYNE FISHER
*Appellant*
v.
## THE STATE OF TEXAS
*Appellee*

————————◆————————

STATE'S APPELLATE BRIEF

————————◆————————

DEVON ANDERSON
District Attorney
Harris County, Texas

CARLY DESSAUER
Assistant District Attorney

LAUREN BYRNE &
KATIE DAVIS
Assistant District Attorney

Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
Tel.: 713/755-5826
Fax No.: 713/755-5809

ORAL ARGUMENT REQUESTED ONLY IF REQUESTED BY APPELLANT

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rule of Appellate Procedure 9.4(g) and Texas Rule of Appellate Procedure 39.1, the State requests oral argument only if appellant requests oral argument.

## IDENTIFICATION OF THE PARTIES

Pursuant to Texas Rule of Appellate Procedure 38.2(a)(1)(A), a complete list of the names of all interested parties is provided below.

Counsel for the State:

**Devon Anderson** — District Attorney of Harris County

**Carly Dessauer** — Assistant District Attorney on appeal

**Lauren Byrne** — Assistant District Attorney at trial

**Katie Davis** — Assistant District Attorney at trial

Appellant or criminal defendant:

**Timothy Wayne Fisher**

Counsel for Appellant:

**Mark C. Kratovil** — Attorney on appeal

**Clyde Williams** — Attorney at trial

Trial Judge:

**Hon. Jan Krocker**

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...................................................... ii

IDENTIFICATION OF THE PARTIES .......................................................................... ii

TABLE OF AUTHORITIES ............................................................................................ iv

STATEMENT OF THE CASE .......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 1

SUMMARY OF THE ARGUMENT ............................................................................... 11

REPLY TO APPELLANT'S POINT OF ERROR ........................................................ 12

I.   The trial court did not err in ruling that Dr. Donaruma's opinions regarding how J.F. was injured, when his injuries occurred, and how much force was used to cause his injuries were reliable and thus admissible..................................... 12

  a.   The trial court did not abuse its discretion when it found Dr. Donaruma's opinion that J.F.'s injuries were the result of physical abuse to be reliable. ...................................................................................... 15

    i. Appellant failed to preserve error...................................................... 15

    ii.   Dr. Donaruma's opinion that J.F.'s injuries were the result of physical abuse was reliable. ...................................................... 17

  b.   The trial court did not abuse its discretion in allowing Dr. Donaruma to testify regarding her expert opinion of when J.F. sustained his injuries over appellant's reliability objection. ....................................................... 18

  c.   The trial court did not abuse it's discretion in finding that Dr. Donaruma's expert opinions regarding the amount of force used to cause J.F.'s injuries were reliable. ........................................................... 20

  d.   Appellant was not harmed by the admission of Dr. Donaruma's opinions............................................................................................................ 22

CONCLUSION ................................................................................................................ 26

CERTIFICATE OF COMPLIANCE ............................................................................ 27

CERTIFICATE OF SERVICE ...................................................................................... 28

# TABLE OF AUTHORITIES

**CASES**

*Acevedo v. State,*
   255 S.W.3d 162 (Tex. App.—San Antonio 2008, pet. ref'd) ................................... 22

*Amspacher v. State,*
   311 S.W.3d 564 (Tex. App.—Waco 2009, no pet.) ............................................. 15, 16

*Anderson v. State,*
   717 S.W.2d 622 (Tex. Crim. App. 1986) ................................................................... 23

*Barshaw v. State,*
   342 S.W.3d 91 (Tex. Crim. App. 2011) ..................................................................... 23

*Chavarria v. State,*
   307 S.W.3d 386 (Tex. App.—San Antonio 2009, no pet.) ....................................... 14

*Clark v. State,*
   365 S.W.3d 333 (Tex. Crim. App. 2012) ................................................................... 19

*Coleman v. State,*
   440 S.W.3d 218 (Tex. App.—Houston [14th Dist.] 2013, no pet.) .......................... 14

*Costal Tankships, U.S.A., Inc. v. Anderson,*
   87 S.W.3d 591 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ............................... 14

*Lane v. State,*
   151 S.W.3d 188 (Tex. Crim. App. 2004) ........................................................ 14, 15, 16

*Nenno v. State,*
   970 S.W.2d 549 (Tex. Crim. App. 1998), *overruled in part on other grounds by*
   *State v. Terrazas,* 4 S.W.3d 720 (Tex. Crim. App. 1999) ................................................. 13

*Petriciolet v. State,*
   442 S.W.3d 643 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) ......................... 23

*Tillman v. State,*
   354 S.W.3d 425 (Tex. Crim. App. 2011) ........................................................ 12, 13, 14

*Weatherred v. State,*
   15 S.W.3d 540 (Tex. Crim. App. 2000) ..................................................... 9, 12, 14, 20

**RULES**

TEX. R. APP. P. 9.4(g) ...................................................................................................... ii

TEX. R. APP. P. 9.4(i) ..................................................................................................... 27

TEX. R. APP. P. 33.1 ..................................................................................... 14, 20

TEX. R. APP. P. 38.2(a)(1)(A) ............................................................................ ii

TEX. R. APP. P. 39.1 ......................................................................................... ii

TEX. R. APP. P. 44.2(b) ................................................................................ 22, 23

TEX. R. EVID. 702 ............................................................................................ 13

TEX. R. EVID. 705(c) ........................................................................................ 13

**TO THE HONORABLE COURT OF APPEALS:**

## STATEMENT OF THE CASE

Appellant was charged with intentionally and knowingly causing serious bodily injury to a child (CR at 56). He entered a plea of not guilty, and a jury trial was held to determine guilt (CR at 638; 6 RR at 7-8). The jury found appellant guilty of the lesser-included offense of reckless injury to a child (CR at 599, 638; 13 RR at 34). Per the jury's recommendation, the court sentenced him to ninety year confinement in the Texas Department of Criminal Justice and assessed a fine of $10,000 (CR at 632, 638; 15 RR at 143, 145). The court certified appellant's right to appeal, and appellant filed a timely notice of appeal (CR at 641, 643).

## STATEMENT OF FACTS

J.F. born to Tegan Shows and appellant on January 24, 2013, while Tegan was incarcerated in Montgomery County (6 RR at 29; 7 RR at 67; 9 RR at 29, 30; 10 RR at 24; Exhibits Vol. 1 at 500). Because of potential complications caused by his forty-three hour delivery and his fussiness, J.F. was kept at the hospital for observation for several days (8 RR at 137-40; 9 RR at 30; 10 RR at 25, 53-54; Exhibits Vol. 1 at 502).

On February 1st, the hospital allowed J.F. to be released (7 RR at 69; Exhibits Vol. 1 at 502). Since Tegan remained in jail, appellant cared both for J.F. and Tegan's six-year old son, A.L. (6 RR at 29; 9 RR at 22; 10 RR at 22). Appellant introduced J.F. to family and friends on Friday, February 1st when appellant brought J.F. to his

1

landlord's business (7 RR at 69; 9 RR at 23). Sherrill Jenkins, appellant's landlady, observed a big scratch underneath the baby's eye that day (7 RR at 69).

On Monday, February 4, 2013, appellant asked Tegan's grandparents, William and Graciela Dickerson, if they would watch J.F. for a few hours while appellant worked (6 RR at 23-24, 30, 110; 9 RR at 20-21). Graciela agreed, and appellant brought J.F. to the Dickersons' home (6 RR at 32, 110; 9 RR at 24). William and Graciela noticed a small scratch under the baby's eye when they first met their great-grandchild and believed that the infant might have scratched himself with his fingernails (6 RR at 30-31, 32, 111).

Two days later, on February 6th, appellant called the Dickersons again to request help with J.F. (6 RR at 41, 112-13; 9 RR at 32). When appellant dropped off J.F., nothing was wrong with the baby (9 RR at 32). Graciela took care of J.F. (6 RR at 40, 113; 9 RR at 32). However, instead of returning in a few hours to pick up his son, appellant's truck broke down, stranding him for the night (6 RR at 42, 113; 9 RR at 33). Another neighbor had been watching A.L., so William picked him up, and the Dickersons watched both of their great-grandchildren for the night (6 RR at 43).

Appellant did not return home until 8:30 or 9:00 o'clock on the night of Thursday, February 7, 2013 (6 RR at 47, 117, 125; 9 RR at 39). Graciela had taken care of both children and had given J.F. a bath (6 RR at 117). Neither great-grandparent noticed anything unusual with J.F. such as bruises or marks on his body, and he was eating well when Graciela returned the baby to appellant's care (6 RR at

2

48-49, 118-20, 125). However, appellant testified that he noticed the scratches on J.F.'s face for the first time when he picked up the children on the night of February 7th, despite the fact that the Dickersons and Sherrill had noticed the scratch days earlier (6 RR at 30-31, 32, 111; 7 RR at 69; 9 RR at 40-41).

On Thursday night, appellant testified that J.F. was fussy and noted that he did not take his entire bottle (9 RR at 45). However, appellant did not testify that anything abnormal occurred that night; instead, he testified that J.F. fell asleep and woke up during the night to eat and have his diaper changed as normal (9RR at 47)

On the morning of Friday, February 8, 2013, appellant thought that J.F. was not acting normally as he was fussy and had diarrhea (9 RR at 49). Appellant took J.F. with him when he walked A.L. to school (6 RR at 127; 7 RR at 21). J.F. was crying when they arrived at the school around 10:00 a.m. which caught the attention of Kathy Otte, a school aid who had previously seen J.F. (7 RR at 15-16, 21). Kathy asked appellant if she could hold J.F., which appellant allowed, but when she took the baby, he shook as if he was startled (7 RR at 23). Alarmed, Kathy also noticed that J.F. had scratches on his eyes and nose as well as a bruise on his head, that his eyes were glossy, and that he did not appear to be coherent (7 RR at 23, 24). Kathy asked appellant what had happened, and appellant said that he thought J.F. had rolled off the bed (7 RR at 24, 25).

Kathy took J.F. to see other school staff because she was concerned that something was wrong with the baby (7 RR at 25-26). Angela Hanson, a teacher at the

3

school, looked at J.F. and also saw lots of scratches on his eyes and face and noticed what looked like a bruise (6 RR at 157, 161, 163-64). She asked appellant how J.F. obtained the bruise, and appellant told her that J.F. had it when he picked the baby up from his grandparent's house (6 RR at 164; 9 RR at 52). Because the school staff were concerned about J.F.'s appearance and believed he was in need of medical aid, Angela called the sheriff's office (6 RR at 167, 173; 7 RR at 30).

On appellant's way home, Graciela saw appellant with J.F. and called out to him to inquiry about the baby (6 RR at 127). Graciela was not close enough to see J.F. but could hear him cry (6 RR at 128). Appellant told Graciela that J.F. was ok, and Graciela advised appellant to feed the baby since he was crying (6 RR at 128).

Around twelve-thirty in the afternoon, Deputy Fred Lerma arrived at appellant's home to conduct a welfare check on J.F. in light of Angela's call (7 RR at 43). Appellant came out holding J.F., and the deputy performed a cursory check of the baby (7 RR at 50, 52, 55-56; 9 RR at 58, 59). Thinking J.F. looked fine from the parts of him that he could see, Lerma left (7 RR at 54, 56; 9 RR at 59).

Around two-thirty on February 8th, appellant took J.F. to Sherril Jenkins' shop because the baby would not stop crying (7 RR at 71; 9 RR at 59-60). Sherrill took J.F. from appellant and noticed bruises on both his checks (7 RR at 73; 9 RR at 60-61). She asked appellant what happened, but appellant did not know (7 RR at 73). Hypothesizing that J.F.'s regular baby formula was bothering him, Sherrill left J.F. with appellant around three o'clock to buy some sensitive formula (7 RR at 71, 74, 9

4

RR at 60, 61; State's Ex. 19). When Sherrill returned, both appellant and J.F. were sleeping in a rocking chair (7 RR at 75; 9 RR at 61).

Shortly after Sherrill returned with the formula, CPS investigator Amber Dewalt arrived at the store (7 RR at 77, 129, 134; 9 RR at 61). Amber noticed the bruising and scratches on J.F.'s face but also saw that his eyes were red and that he was jerking in a manner that was not normal for an infant (7 RR at 136, 137; 9 RR at 62). Thinking that J.F. might have a head injury, Amber said that J.F. needed to be taken to the hospital and called 911 (7 RR at 138; 9 RR at 62).

EMS received a dispatch to attend to J.F. at 3:59 p.m. (7 RR at 167). Once they got the baby in an ambulance, they removed his clothing, and Amber saw that he had purple bruises around his shoulders (7 RR at 140, 170). J.F.'s breathing was slow, and he was turning gray from lack of air (7 RR at 140, 171, 172).

The ambulance rushed J.F. to Texas Children's Hospital in Houston (7 RR at 169, 180). Dr. Cara Doughty was an emergency room pediatrician working that afternoon who treated J.F. (7 RR at 180, 182). Dr. Doughty's assessment was that the fifteen-day-old baby "was critically ill" and "in danger of dying" (7 RR at 183). His mental state was abnormal as he could not breathe normally, cry, be consoled, or fix his eyes on things (7 RR at 184). J.F. was having seizures, and the soft spot on his head was swelling, indicating increased pressure inside his brain (7 RR at 192, 193). He also had bruises on his face, shoulders and upper arms (7 RR at 185).

5

In effort to assist J.F.'s labored breathing, the doctors inserted a breathing tube (7 RR at 183). The doctors took CT scans of J.F.'s head which showed that he had a fracture on the left side of his skull and bleeding inside his brain (7 RR at 192). Through later tests, it was also determined that J.F. had sustained a broken rib in addition to his other injuries (8 RR at 165-66). Because of the severity of his injuries, at the time of trial J.F. had the developmental level of a two to four month old despite the fact that he was fourteen months old and had been in physical therapy for months (8 RR at 67, 81, 82, 84).

At appellant's trial, several expert witnesses testified regarding J.F.'s injuries. First, Dr. Doughty, J.F.'s treating physician testified without objection that the combination of J.F.'s injuries were "most consistent with trauma or abuse" and noted that trauma would have to be caused to him because "[i]nfants don't…at this age don't crawl, don't walk, don't cause themselves trauma. So, in terms of trauma, trauma is cased to them. Someone else has to do this to them" (7 RR at 180, 184-85, 191, 192, 193). Dr. Doughty believed significant direct force to J.F.'s head would have had to be applied to cause his injuries and stated that a single fall to the floor would not have caused his injuries (7 RR at 194). Dr. Doughty testified—again without objection—that J.F.'s injuries did not occur from normal handling, that force greater than the force necessary to handle a baby in day-to-day activities was used to cause his injuries, and that his injuries did not occur from normal handling or a single, accidental fall (7 RR at 193, 195). To Dr. Doughty, J.F.'s head injuries indicated

6

shaking and impact over time, and she testified that his injuries were not caused accidentally (7 RR at 194, 195). Believing that J.F. had been physically abused, Dr. Doughty testified that "[t]here is really nothing else that could have caused [J.F.'s] constellation of symptoms" (7 RR at 197, 212-13; State's Ex. 21).

In addition to Dr. Doughty's testimony, the State called Dr. Marcella Donaruma, assistance professor of pediatrics and fellowship director for the child abuse program at the Baylor College of Medicine and Texas Children's Hospital, to testify (8 RR at 91). Appellant objected to the reliability of Dr. Donaruma's expert opinions and a hearing on their admissibility was held outside the presence of the jury (8 RR at 7, 99).

At the hearing, Dr. Donaruma testified that J.F. had abusive head trauma, abusive skeletal trauma, and abusive cutaneous trauma that she believed was caused by physical abuse (8 RR at 105-6). Specifically, Dr. Donaruma believed that J.F.'s skull fracture by blunt force impact of an object to J.F.'s skull or his skull to an object (8 RR at 106). Based on her training and experience as well as her knowledge of studies of the amount of force needed to cause accidental injuries, she testified that she believed that the amount of force needed to cause J.F.'s skull fracture was the equivalent to the force of a head to head collision in football (8 RR at 107). Because J.F. had also sustained spine damage in his neck as well as brain damage, Dr. Donaruma believed that J.F. had been subjected to violent whiplashing forces that were greater than the force needed to move an infant through its daily activities (8 RR

7

at 108-9, 123). In addition to her training and experience, Dr. Donaruma came to these opinions by relying on studies, evaluations, lectures, and conferences that are accepted in the medical community (8 RR at 107, 108, 109, 113). While appellant objected to her expert opinions on the basis that they were based on junk science that was not evidence-based, Dr. Donaruma informed the trial court that despite the fact that ethics prohibited actual studies on babies, a large body of peer-reviewed articles discussing findings of animal studies also supported her opinions (8 RR at 111, 116, 117, 118). Throughout the hearing, Dr. Donaruma revealed her familiarity with the body of research in her field by naming studies that had been published, as well as studies whose results might not yet have been published, and discussing the methodology of various studies in addition to her opinion of some of them (8 RR at 107, 108, 109, 112-3, 114, 115, 117-8, 123-24, 125).

Dr. Donaruma also established an opinion regarding when J.F.'s injuries occurred (8 RR at 123, 131). Based on the CT scans done on J.F. after he was admitted to Texas Children's, the brain hemorrhaging and diffuse brain trauma she observed, and his rapid decompensation in the emergency room, Dr. Donaruma believed that J.F.'s injuries occurred within a twelve-hour window of time proceeding his arrival at the hospital (8 RR at 131, 132). She informed the court that her opinion was based on studies of known timed accidental injuries in pediatric patients and that her studies in the field of child abuse pediatrics taught her how to develop a time frame for when injuries occurred in a child (8 RR at 123-25, 126). Dr. Donaruma

8

noted that her time frame was a rough window, and she felt that it would be irresponsible to give an exact time (8 RR at 123-24, 133).

After the hearing, the trial court found Dr. Donaruma's opinions regarding the force used to cause J.F.'s injuries reliable over appellant's object that Dr. Donaruma should not be able to testify to it because she "was unable to determine the G forces operating on [J.F.] at the time" and that there was "no scientific basis for the window of timing" (8 RR at 129, 130-31). The court also rejected appellant's objection to Dr. Donaruma's opinion regarding the abusive nature of J.F.'s injuries (8 RR at 129, 130-31). Finally, the court also overruled appellant's argument that Dr. Donaruma's opinion on the timing of J.F.'s injuries was not reliable because she could not establish a specific time (8 RR at 133).[1]

Appellant called Dr. Leo Hochhauser, a pediatric and adult neuroradiologist, to testify regarding J.F.'s head injuries (10 RR at 67). Dr. Hochhauser testified that J.F.'s CT scan showed defuse swelling in his brain, a skull fracture, and bleeding in the brain (10 RR at 78, 80, 82). Dr. Hochhauser testified that based on the CT scans, he believed that J.F.'s injuries occurred between 12 to 24 hours of the CT scans being taken, but he testified that he would expand the time range from 3 hours up to 36 hours as a precaution (10 RR at 86, 96). However, he remarked that the injuries on

---

[1] Since appellant's point of error involves the trial court's ruling on the admissibility of Dr. Donaruma's opinions and this Court must review the trial court's ruling in light of what was before the trial court at the time the ruling was made, the State will limit its presentation of Dr. Donaruma's testimony in this statement of facts to the evidence before the trial court when it decided to admit her expert opinions. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

9

J.F.'s CT scan were "pretty, pretty recent" and explained that after sustaining trauma, J.F.'s brain would begin swelling within the first three or four hours (10 RR at 93, 101). Dr. Hochhauser informed the jury that after sustaining the head injury, J.F. would be unable to eat normally (10 RR at 102).

Dr. Hochhauser went on to explain that injuries could be accidental and non-accidental (10 RR at 88). He differentiated the accidental from the non-accidental by the presence of a traffic accident or known cause of the trauma (10 RR at 88). He testified that if there was no history of trauma, he would be very suspicious of the cause of a patient's injuries (10 RR at 89-90). Dr. Hochhauser acknowledged that if he were the doctor on J.F.'s case and he saw the CT scan taken of J.F.'s injuries, he would report the case for child abuse unless there was a documented trauma like a car accident (10 RR at 91-92). To Dr. Hochhauser, retinal hemorrhaging, brain bleeding, brain swelling, a skull fracture, a rib fracture, and bruising in a fifteen-day-old infant indicated child abuse (10 RR at 103). He testified that the bleeding all over J.F.'s brain was consistent someone grabbing and shaking the baby (10 RR at 100). Dr. Hochhauser agreed that the amount of force needed to cause J.F.'s skull fracture was major because infant's skulls are more malleable than older children (10 RR at 99).

Appellant also called forensic engineer John Laughlin to testify regarding J.F.'s injuries (10 RR at 122). Laughlin believed that J.F.'s injuries were caused by being dropped on the top of his head (10 RR at 132; 11 RR at 46). He estimated the force that caused the injury to be around eight miles an hour (10 RR at 133; 11 RR at 49).

He compared the force of eight miles an hour to the equivalent of someone running fast into a wall (10 RR at 147). Laughlin believed that J.F. could have been intentionally dropped (10 RR at 134). In Laughlin's opinion, J.F. was not shaken because he did not believe the damage to J.F.'s neck was "significant" (10 RR at 136-37; 11 RR at 50, 53).

## SUMMARY OF THE ARGUMENT

The trial court did not abuse its discretion when it found that Dr. Donaruma's expert opinions regarding how J.F. was injured, when he was injured, and how much force was used to cause his injuries were reliable because Dr. Donaruma based her opinions on her training and experience, J.F.'s medical records documenting the infant's injuries, and comparisons of his injuries to studies accepted in the medical community. Because her opinions were based on scientific studies and methods, the trial court did not err. For the sake of argument, even if the trial court abused its discretion by admitting Dr. Donaruma's opinions, appellant was not harmed as substantially similar testimony was presented to the jury by other experts without objection.

## REPLY TO APPELLANT'S POINT OF ERROR

**I.    The trial court did not err in ruling that Dr. Donaruma's opinions regarding how J.F. was injured, when his injuries occurred, and how much force was used to cause his injuries were reliable and thus admissible.**

In his sole issue on appeal, appellant argues that the trial court abused its discretion when it found Dr. Donaruma's expert opinions to be reliable. While he alleges that her opinions regarding whether J.F.'s injuries were the result of physical abuse, when J.F. sustained his injuries, and the amount of force used were insufficiently reliable to be admitted, the trial court did not abuse its discretion in finding Dr. Donaruma's expert opinions to be reliable because they were based on accepted scientific studies and methods.

The State will respond to each of appellant's arguments regarding Dr. Donaruma's opinions individually.

### *Standard of Review*

Appellate courts review a trial court's ruling on the admissibility of expert testimony for an abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). The reviewing court determines if the trial court's ruling lies in the zone of reasonable disagreement based on the evidence presented at the time of the ruling. *Weatherred*, 15 S.W.3d at 542.

12

### Applicable Law

Texas Rule of Evidence 702 governs the admission of expert testimony. TEX. R. EVID. 702; *Tillman*, 354 S.W.3d at 435. Rule 702 provides that "[i]f scientific, technical, or other special knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. Additionally, Rule of Evidence 705(c) adds that a court must determine that the facts and data underlying the expert's testimony provide a sufficient basis for the proffered opinion to be admissible. TEX. R. EVID. 705(c). For expert testimony to be admissible, the proponent of the evidence must show by clear and convincing evidence that the expert testimony "is sufficiently reliable and relevant to help the jury in reaching accurate results." *Tillman*, 354 S.W.3d at 435 (quoting *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992)).

When determining the reliability of expert testimony, the focus on a court's analysis is "whether the evidence has its basis in sound scientific methodology such that testimony about 'junk science' is weeded out." *Tillman*, 354 S.W.3d at 435 (quoting *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)). However, the analysis of whether expert testimony is reliable depends on whether the expert's field of expertise falls into the "hard" or "soft" scientific context. *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled in part on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999).

13

When addressing fields of expertise based primarily on experience and training as opposed to the scientific method, courts apply the "soft" science standard set by the Court of Criminal Appeals in *Nenno*. *Coleman v. State*, 440 S.W.3d 218, 226 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see also Weatherred*, 15 S.W.3d at 542 (citing *Nenno* for the standard under which to analyze the reliability of "soft" scientific evidence); *Chavarria v. State*, 307 S.W.3d 386, 389-90 (Tex. App.—San Antonio 2009, no pet.) (discussing different standards for "hard" and "soft" sciences). When the expert offers testimony in a field considered to be one of "soft" science, the proponent must establish that (1) the expert's field of expertise is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) that the expert's testimony properly relies on or utilizes the principles involved in the field." *Tillman*, 354 S.W.3d at 435-36 (quoting *Weatherred*, 15 S.W.3d at 542). Medical testimony falls inside of the "soft" science category. *Costal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 604 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (noting medical causation opinion testimony falls outside the "hard" science category).

To preserve error, a party must timely and specifically object each time evidence is offered and obtain a ruling. TEX. R. APP. P. 33.1. However, any error in the admission of evidence is cured when the same evidence comes in elsewhere without objection, either before or after the complained-of ruling. *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004). A defendant who fails to preserve error

14

regarding the admissibility of evidence forfeits his complaint on appeal. *Amspacher v. State*, 311 S.W.3d 564, 572 (Tex. App.—Waco 2009, no pet.).

*Analysis*

a. **The trial court did not abuse its discretion when it found Dr. Donaruma's opinion that J.F.'s injuries were the result of physical abuse to be reliable.**

Appellant first alleges that the trial court erred when it found that Dr. Donaruma's opinion that J.F.'s injuries were caused by physical abuse to be reliable. However, in making this argument, appellant overlooks that he failed to preserve error on this ground by failing to object when other expert witnesses testified that J.F.'s injuries were the result of physical abuse. Even if appellant had not waived error, the trial court did not err as Dr. Donaruma's was based on accepted principles of her field.

i. **Appellant failed to preserve error.**

Appellant waived his argument regarding Dr. Donaruma's opinion that J.F.'s injuries were caused by physical abuse because he failed to object when the same opinion was given by Dr. Doughty and Dr. Hochhauser. *See Lane*, 151 S.W.3d at 193 (stating that any error in the admission of evidence is cured when the same evidence comes in elsewhere without objection).

As the record shows, before Dr. Donaruma testified, appellant allowed Dr. Doughty to testify without objection that J.F.'s injuries were "most consistent with trauma or abuse" (7 RR at 185). Dr. Doughty went on to give her opinion that J.F.'s

15

injuries were not cause by accidental mishandling (7 RR at 195). When asked on cross-examination whether the presence of CPS influenced her belief that J.F.'s injuries were consistent with physical abuse, she told the jury that "[t]here is really nothing else [other than abuse] that could have caused [J.F.'s] constellation of symptoms" (7 RR at 212-13). Similarly, Dr. Hochhauser testified that if he were a doctor on J.F.'s case and if he saw the CT scans taken of J.F.'s injuries, he would report the case for child abuse unless there a documented trauma like a car accident had occurred (10 RR at 91-92). In Dr. Hochhauser's opinion, the difference between accidental injuries and physical abuse was a known cause of trauma and without explanation of the cause of a patient's injury, he would be very suspicious (10 RR at 88, 89-90). As there was no documented cause of trauma, physical abuse was the only other explanation for J.F.'s severe injuries.

As both Dr. Doughty and Dr. Hochhauser testified regarding their opinions and their reasoning for why J.F.'s injuries were caused by physical abuse without objection, appellant failed to preserve error for his argument that Dr. Donaruma should not have been able to testify regarding her same opinion. *See Lane*, 151 S.W.3d at 193. As such, appellant forfeited this complaint on appeal, and this Court should overrule his argument. *Amspacher*, 311 S.W.3d at 572.

### ii. Dr. Donaruma's opinion that J.F.'s injuries were the result of physical abuse was reliable.

Should this Court decide to address appellant's argument that the trial court abused its discretion in allowing Dr. Donaruma to give her opinion that J.F.'s injuries were caused by physical abuse, this Court should hold that the trial court did not err.

As Dr. Donaruma testified at the hearing, based on her training and experience, she believed that physical abuse caused J.F.'s skull fracture, the trauma on the outside of his head, his brain damage, and his injury to the neck area of his spine (8 RR at 106, 108). She identified J.F.'s injuries as abusive head trauma, abusive skeletal trauma, and abusive cutaneous trauma (8 RR at 105). She believed that J.F.'s skull fracture was caused when J.F.'s skull was hit by an object with blunt force or hit an object with blunt force (8 RR at 106). His spine injury was caused by violent whiplashing forces to his head (8 RR at 108). Dr. Donaruma informed the court at the hearing that in making her opinion that J.F. was physically abused, she relied on her review of J.F.'s injuries, her training and experience as well as her knowledge of studies, evaluations, lectures and conferences that are accepted in the medical community (8 RR at 107, 108, 109).

Because Dr. Donaruma arrived at her opinion that J.F.'s injuries were caused by physical abuse by relying on accepted principles in her field—examination of the child's injuries, references to accepted  studies, lectures, conferences, and papers, and her own training and experience, the trial court did not abuse its discretion in finding

17

her opinion reliable. *See Tillman*, 354 S.W.3d at 435-36 (noting that whether the expert properly relies on principles in the field as a factor of reliability). Should this Court chose to address appellant's waived argument on the merits, it should nevertheless hold that the trial court did not err.

**b. The trial court did not abuse its discretion in allowing Dr. Donaruma to testify regarding her expert opinion of when J.F. sustained his injuries over appellant's reliability objection.**

The trial court did not abuse its discretion in allowing Dr. Donaruma to testify to her opinion that J.F.'s injuries occurred in a twelve-hour window of time before being admitted to Texas Children's. As her opinion was based on J.F.'s condition when he arrived at the hospital, his CT scans, her training and experience, and her comparison of J.F.'s injuries with published studies that are accepted in the medical community, the trial court did not err in finding her opinion reliable.

As Dr. Donaruma explained at the hearing, she formulated a rough timeframe in which she believed that J.F. sustained his injuries which the State intended to introduce before the jury (8 RR at 123). In coming to her opinion that J.F. sustained his injuries about twelve hours before being admitted to the hospital, Dr. Donaruma examined J.F.'s CT scans in consultation with a neuroradiologist, observed the appearance of the blood hemorrhaging inside of his head that was visible on the scans, and considered his "rapid decompensation" when brought to Texas Children's that led to emergency intubation because he was not breathing adequately on his own

18

(8 RR at 102-4, 131-32). She compared J.F.'s injuries with published studies documenting the injuries of car accident victims—including pediatric patients—that discussed the timing and progression of injuries (8 RR at 123-24, 125-26). As Dr. Donaruma explained to the court, these studies helped her assign a rough window of time in which J.F.'s injuries occurred (8 RR at 124). Dr. Donaruma informed the court that she had both training and experience in comparing injuries by this method to estimate a timeframe for injuries with consultations with radiologists (8 RR at 126). *See Tillman*, 354 S.W.3d at 435-36. Thus, the hearing established that her opinion was based on J.F.'s rapidly deteriorating physical condition when brought to the hospital, the need for emergency intervention to help him breathe, his CT scans, comparisons with published studies, and her training and experience.

Given Dr. Donaruma's testimony at the hearing, the trial court did not abuse its discretion in finding her opinion regarding when J.F.'s injuries occurred to be reliable. While appellant attacks Dr. Donaruma's opinion regarding the timing of J.F.'s injuries in his brief as being based entirely on the appearance of blood in his CT scans, in making this argument, appellant ignores the totality of the information Dr. Donaruma took into consideration when forming her opinion.[2] Appellant's Br. 34.

---

[2] Appellant also argues for the first time on appeal that Dr. Donaruma's opinion was not reliable because she did not explain the scientific basis of her analysis of the appearance of blood in the CT scans. Appellant's Br. 34; *see Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (stating that an argument on appeal must comport with the objection made at trial). At the hearing, Dr. Donaruma mentioned that she relied on the CT scans in her analysis after reviewing the images, reviewing the neuroradiologist's report of them, and discussing the neuroradiologist's findings with

19

Since her opinion regarding the timing of J.F.'s injuries was based on more than the CT scans because she also took into consideration J.F.'s "rapid decompensation" and trouble breathing because of the injuries he sustained, the trial court did not abuse its discretion in finding her opinion reliable (8 RR at 132, 133).

Because the trial court did not abuse its discretion in overruling appellant's objection to the reliability of Dr. Donaruma's expert opinion regarding when J.F. sustained his life-threatening injuries, the trial court did not err. As such, this Court should uphold its ruling on appeal.

### c. The trial court did not abuse it's discretion in finding that Dr. Donaruma's expert opinions regarding the amount of force used to cause J.F.'s injuries were reliable.

The trial court also did not abuse its discretion when it found that Dr. Donaruma's opinion regarding the amount of force used to cause J.F.'s injuries was reliable because her opinion was based on her training and experience as well as studies on the amount of force used to cause documented injuries which are accepted in the medical community.[3]

---

the neuroradiologist (8 RR at 102-4). Despite this explanation of her methods, appellant argues that the lack of explanation of her reading of the CT scans made her opinion unreliable. Appellant's Br. 35. However, appellant did not raise this objection to the trial court during the hearing, and the portion of the record that includes Dr. Donaruma's discussion of the blood visible on J.F.'s CT scans occurred after the trial court made its ruling (8 RR at 142-43, 178-79). As appellant did not raise this particular objection at trial and this Court is limited in its review to what was before the trial court at the time the ruling was made, appellant's argument is not preserved. TEX. R. APP. P. 33.1; *Weatherred*, 15 S.W.3d at 542.

[3] In his brief, appellant casts Dr. Donaruma's opinion on the amount of force used to cause J.F.'s injuries as an amount that six-year old L.A. could not have inflicted. Appellant's Br. 38-39. This

As Dr. Donaruma testified at the hearing, she compared J.F.'s injuries with studies accepted by the medical community that looked at the amount of force needed to cause similar injuries to form her opinions regarding the amount of force used (8 RR at 109, 108-9, 113, 123). Her opinions varied based on the type of injury as she calculated different levels of force for J.F.'s head and spinal injuries (8 RR at 107, 108-9, 123). Dr. Donaruma explained that she calculated the force used to cause J.F.'s brain injury to be the equivalent of a head-to-head collision in football because the resulting injury from such force would be a concussion—which J.F. had (8 RR at 107, 113-14). In making this determination, Dr. Donaruma noted that the amount of force used was just one consideration as the type of injury was also important; she explained to the court that a head-to-body injury at the same level of force would not be as bad as the injury resulting from a head-to-head collision (8 RR at 113). For J.F.'s spinal injury, Dr. Donaruma informed the trial court that the amount of force needed to cause such an injury was harder to equate with a physical number or equivalent activity because it was caused by trauma that occurred more rarely than J.F.'s head trauma (8 RR at 108). While evaluations and descriptions of the level of force used to cause such injuries existed, Dr. Donaruma conservatively estimated the amount of force to be greater than the force needed to move an infant through its daily activities or the force of an infant's head flopping back and forth (8 RR at 108-9, 123).

portrayal of Dr. Donaruma's opinion ignores the doctor's opinions as they were given at the hearing (8 RR at 107, 108-9, 113-14, 123). *See Weatherred*, 15 S.W.3d at 542.

21

Because Dr. Donaruma relied on studies on force that were accepted in the medical community to compare with J.F.'s injuries in order to form her opinion on the amount of force used, the trial court properly overruled appellant's objection that her expert opinion was unreliable because she did not calculate a specific number for the force used (8 RR at 129). Since Dr. Donaruma relied on principles utilized in the field, the trial court did not abuse its discretion even though she gave examples of equivalent forces rather than a precise calculation. *See Tillman*, 354 S.W.3d at 435-36. Thus, the trial court did not err when allowing Dr. Donaruma to give her opinion that the amount of force used to cause J.F.'s head trauma was similar to the amount of force in a head-to-head football collision while the force used to cause his spinal injury was greater than the force necessary to carry a baby in its daily activities. As such, this Court should uphold the trial court's ruling.

### d. Appellant was not harmed by the admission of Dr. Donaruma's opinions.

Assuming for the sake of argument that the trial court did abuse its discretion when it found that Dr. Donaruma's opinions were reliable, the error was harmless because substantially the same evidence was admitted elsewhere without objection.

### Standard of Review

Reviewing courts analyze the harm associated with the erroneous admission of expert testimony under Rule 44.2(b). *Acevedo v. State*, 255 S.W.3d 162, 170 (Tex. App.—San Antonio 2008, pet. ref'd); *see* TEX. R. APP. P. 44.2(b). As non-

constitutional error, reversal is only required if the trial court's ruling affected the substantial rights of the accused. TEX. R. APP. P. 44.2(b); *see Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *Petriciolet v. State*, 442 S.W.3d 643, 653 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). However, the erroneous admission of evidence may be rendered harmless when substantially the same evidence is admitted elsewhere without objection. *Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986) ("Inadmissible evidence can be rendered harmless if other evidence at trial is admitted without objection and it proves the same fact that the inadmissible evidence sought to prove."); *Petriciolet*, 442 S.W.3d at 654. Reviewing courts will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, it has fair assurance that the error did not influence the jury or had but a slight effect on the jury. *Barshaw*, 342 S.W.3d at 93; *Petriciolet*, 442 S.W.3d at 654.

### Analysis

Appellant was not harmed by the trial court's ruling allowing Dr. Donaruma to testify because substantially similar testimony was admitted through the testimony of other experts without objection by appellant. *See Anderson*, 717 S.W.2d at 628; *Petriciolet*, 442 S.W.3d at 654. Indeed, the opinions that appellant complains about on appeal were given by other experts at trial.

Discussed above, Dr. Doughty and Dr. Hochhauser both testified without objection to their opinions that J.F.'s injuries were caused by physical abuse. Dr. Doughty specifically informed the jury that J.F.'s injuries were not cause by accidental

23

mishandling and that physical abuse was the only thing "that could have caused [J.F.'s] constellation of symptoms" (7 RR at 195, 212-13). Similarly, Dr. Hochhauser testified that if he were a doctor on J.F.'s case and if he saw the CT scans taken of J.F.'s injuries, he would report the case for child abuse unless there a documented trauma like a car accident had occurred (10 RR at 91-92). Since there was no documented cause of trauma in J.F.'s case, his discussion that physical abuse would be the only other explanation for J.F.'s severe injuries provided the same conclusion that Dr. Donaruma reached. Because the same opinions were given by other experts as Dr. Donaruma's opinion that J.F.'s injuries were caused by physical abuse, appellant was not harmed by the trial court's ruling admitting the evidence.

Furthermore, the record shows that appellant was not harmed by the trial court's decision to allow Dr. Donaruma to testify to her opinion that J.F. was injured in a twelve-hour window of time before his CT scans were taken because appellant's expert witness, Dr. Hochhauser, testified to a substantially similar opinion. Dr. Hochhauser informed the jury that J.F.'s injuries occurred within a twelve to twenty-four hour window of time but noted that he expanded that range to include three to thirty-six hours as a precaution (10 RR at 86, 96). Since Dr. Hochhauser's testimony provided substantially the same time-frame as Dr. Donaruma's rough twelve hour window without objection from appellant, appellant was not harmed by the court's ruling.

24

Similarly, both Dr. Doughty and Laughlin, appellant's own expert, provided similar testimony to Dr. Donaruma's opinions on the amount of force used to cause J.F.'s injuries. As the record shows, Dr. Doughty informed the jury that J.F. sustained significant direct force to his head to cause his head injuries (7 RR at 193-94). She testified without objection that normal handling or even a single fall to the floor would not have caused his injuries (7 RR at 193-94, 195). Her depiction of the amount of force needed to cause J.F.'s injuries as greater than the force of normal handling of an infant is the same as Dr. Donaruma's opinion that the amount of force used was greater than the force needed to move an infant through its daily activities or the force of an infant's head flopping back and forth (8 RR at 108-9, 123).

Additionally, Laughlin testified that eight miles an hour—the amount of force that he calculated as the force that caused J.F.'s head injury—would be the equivalent of someone running into a wall at a speed that "is towards the limits of the average person's ability (10 RR at 147). His testimony describing the amount of force as a person running into a wall provided a different analogy to Dr. Donaruma's depiction that the amount of force is equal to a head-to-head football collision, but their description of the amount of force presented substantially similar evidence of the degree of force used to cause J.F.'s injuries to the jury.

Because other experts testified to their opinions that were substantially similar to Dr. Donaruma's opinions without objection, appellant was not harmed by the trial court's finding that Dr. Donaruma's opinions were reliable. Thus, even if this Court

25

holds that Dr. Donaruma's opinions were not reliable, this Court should nevertheless uphold the trial court's ruling and affirm appellant's conviction.

## CONCLUSION

The State of Texas respectfully urges the Court to overrule appellant's point of error and affirm his conviction.

**DEVON ANDERSON**
District Attorney
Harris County, Texas

/s/ *Carly Dessauer*

**CARLY DESSAUER**
Assistant District Attorney
Harris County, Texas
 1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-5826
State Bar No. 24069083
dessauer_carly@dao.hctx.net
curry_alan@dao.hctx.net

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned attorney certifies that this computer-generated document has a word count of 6,923 words, based upon the representation provided by the word processing program that was used to create the document. TEX. R. APP. P. 9.4(i).

/s/ *Carly Dessauer*

**CARLY DESSAUER**
Assistant District Attorney
Harris County, Texas
 1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-5826
State Bar No. 24069083

## CERTIFICATE OF SERVICE

The State will serve a copy of the foregoing instrument to appellant's attorney

though TexFile:

Mark C. Kratovil
Assistant Public Defender
1201 Franklin, 13th Floor
Houston, Texas 77002
mark.kratovil@pdo.hctx.net

/s/ *Carly Dessauer*

**CARLY DESSAUER**
Assistant District Attorney
Harris County, Texas
 1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-5826
State Bar No. 24069083

Date:  February 27, 2015